UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


UNITED STATES OF AMERICA,              Case No. 3:22-CR-00079-JZ-2

          Plaintiff,
                                       Toledo, Ohio
     vs.
                                       **MONDAY, OCTOBER 31, 2022**
MELISSA HUTCHINSON,

          Defendant.


- - - - -

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE JACK ZOUHARY
SENIOR UNITED STATES DISTRICT JUDGE




APPEARANCES:

For the Government:        **Matthew D. Simko,**
                           *Assistant United States Attorney*


For the Defendant:         **Merle R. Dech, Jr.,** *Esquire*
                           610 Adams Street, 2nd Floor
                           Toledo, Ohio  43604
                           (419)241-5506


Official Court Reporter:   Diana M. Ziegelhofer, RPR, RCR
                           United States District Court
                           1716 Spielbusch Avenue, Suite 118
                           Toledo, Ohio  43604
                           (419) 213-5538

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

**I N D E X**

                                                          **PAGE**

**GOVERNMENT'S WITNESSES**

**STEVE MCGRATH**
          DIRECT EXAMINATION BY MR. SIMKO:          5
          CROSS EXAMINATION BY MR. DECH:           12
          REDIRECT EXAMINATION BY MR. SIMKO:       19
          FURTHER REDIRECT EXAMINATION BY MR. SIMKO: 48

                                                          **PAGE**

**DEFENSE WITNESSES**

**MELISSA HUTCHINSON**
          DIRECT EXAMINATION BY MR. DECH:          21
          CROSS EXAMINATION BY MR. SIMKO:          25
          REDIRECT EXAMINATION BY MR. DECH:        50


**GOVERNMENT'S EXHIBITS**

 1 (photograph)

- - -

**MONDAY, OCTOBER 31, 2022**

(Proceedings commenced in open court at 10:09 a.m.)

THE COURT:  Good morning.  We are here on case number 22-CR-79-02, the United States versus Melissa Hutchinson.  Amanda Winner is present as our presentence writer.  Matt Simko for the government.  Merle Dech for the defendant.

This is a sentencing hearing.  I have a presentence report prepared by Amanda, dated September 19, with a revision date of October 13.

As an initial matter, we need to establish the appropriate guideline range and, in that regard, there is an objection to the presentence report.  It's reflected in document 24 in the addendum at page 18.  Following that, we have the defendant's sentencing memo, document number 27, which continues the objection to paragraph 25 of the presentence report, specifically, the four level enhancement under specific offense characteristics.  This Court, having had an opportunity to review that memo, filed an Order, as document number 28 on the docket, indicating and reflecting the Court's questions and concerns, if you will, about whether that enhancement is appropriate, and that will be our first order of business this morning.

Having talked briefly with counsel for both

sides, I understand there may be argument or testimony or both with respect to the applicability of that enhancement.

And I'll start with the government to see if there is any argument or evidence they wish to put on with respect to that.

MR. SIMKO:  Your Honor, I don't think we are in disagreement about the facts of the presence of the firearm, the obliterated serial number.  I think most of the government's position is a legal argument; however, I do think -- I do have an agent here to testify to some general facts about this case and it may inform this enhancement, so I'd like to call him at this time and hear what he has to say.

THE COURT:  Thank you.  Come forward, please.  Our courtroom deputy will administer the oath for you.

- - -

Thereupon, the GOVERNMENT, in order to maintain the issues on their part to be maintained, called as a witness,

STEPHEN MCGRATH,

who, having been duly sworn as provided by law, testified and said as follows:

THE COURT:  Please proceed.

MR. SIMKO:  All right.

- - -

DIRECT EXAMINATION

BY MR. SIMKO:

Q        Special Agent McGrath, can you, if you didn't already, can you say and spell your name and tell the Court a little bit about your background.

A        First name is Steve, last name is McGrath, M-C-G-R-A-T-H.  I'm a special agent assigned to the Bureau of Alcohol, Tobacco, and Firearms.  I have been since April of 2021.  Prior to that, I served as a police officer for the Toledo Division of Police where I served as a detective and sergeant of the gangs task force.

Q        You were also a task force officer with ATF at that time?

A        Yes, sir.

Q        You were the case agent in this case; is that correct?

A        Yes.

Q        All right.  How did you become initially involved being the case agent?

A        Initially, we received a tip from a pawn shop in regards to a suspicious transaction, and I received a tip, so I followed up on it and I spoke to several people involved and reviewed some video footage and reviewed some documents.

Q        All right.  And those video footage documents

show pawning of firearms at a pawn shop and, ultimately, the possession of firearm by the defendant, Ms. Hutchinson, and her husband, Richard Hutchinson; is that correct?

A        Yes.

THE COURT:  Pause, please.  I don't think your mic is on, is it?  Neither of them are picking up on my speaker.

THE WITNESS:  Speak louder?

THE COURT:  Thank you, both, very much.

DEPUTY CLERK:  Did you test that, Matt?

MR. SIMKO:  Yes, I did.  It works.

DEPUTY CLERK:  Okay.

Q    (By Mr. Simko) All right.  Ultimately, this investigation and these review of these videos culminate in the execution of the search warrant at the defendant's residence; is that right?

A        Yes.

Q        Can you tell the Court a little bit about what you found at the residence.

A        At the residence, we found multiple firearms, ammunition inside of a safe, multiple magazines.

Q        Okay.  And the magazines in this case -- well, also, did you search the defendant's bedroom?

A        Yes.

Q        All right.  And you are aware they are a married

couple, correct?  Both defendant's, right?

A        Yes.

Q        All right.  Did you, as part of your search, come to have an opinion about essentially whose side of the bed who slept on, and how did you come to that opinion, if you have one.

A        Yes.  I, obviously, didn't search the apartment myself.  Myself, and I was accompanied by several special agents from the ATF as well as task force officers with the Toledo Police Department.  Upon searching the bedroom, it appeared as though Richard Hutchinson and Melissa Hutchinson had identified sides of the room and or bed that was identified through the items that were on the night stands that were on either side of the bed and or tables, whichever you would refer it as, and their respective phones on either side of the bed.

        I, myself, did not personally find the items in there.  I was conducting the interview of Melissa Hutchinson at the time the search was taking place, but I was inside the residence and did observe the residence.

Q        All right.  And so do you -- as it relates to the side of the bed that Richard Hutchinson was identified with, and your opinion or the search party's opinion was his side of the bed, what of relevance to this case was found on that side of the bed?

A          On that side of the bed, there was an H&R Pardner shotgun that was clearly on that side of the bed as well as a bag that contained a loaded magazine.

Q          Okay.  The H&R Pardner being one of the firearms being pawned from the pawn shop and identified in the indictment; is that right?

A          Yes.

Q          Okay.  Now did you have an opportunity to interview Ms. Hutchinson, the defendant?

A          I did.

Q          All right.  And what did she tell you regarding safes in the house or how the safes were accessed?

A          I don't recall her providing specific details about how the safes were accessed.  I did know one safe, particularly, it was required to have her fingerprints.  It was required she had to open the safe with her fingerprints, so the safe was actually brought out of the bedroom into the kitchen where she opened the safe.

Q          Okay.  And there were additional safes that were key access; is that right?

A          Yes.

Q          All right.  In the safe that was biometrically -- that needed a fingerprint, at least a fingerprint, if not other peoples' fingerprint, what was found in that safe?

A          There was two firearms inside that safe.

Q        All right.  One of them was a handgun; is that correct?  Or they were both handguns?

A        They were both handguns, yes.

Q        All right.  And one of those firearms had obliterated serial numbers; is that correct?

A        Yes, it did.

Q        In the other safes, was there found magazines?

A        Yes.

Q        All right.  High capacity magazines; is that right?

A        Yes.

THE COURT:  How many other safes are we talking about, two, three, one?  I'm unclear.

A        There is three safes total, sir.

THE COURT:  So one had the fingerprint and then there were two others?

A        Yes.

THE COURT:  Thank you.  Did you observe -- I'm sorry to interrupt you.  Did you observe those other two safes and what was in each one?

A        Yes.  All three safes were located in the closet, a walk-in closet.  And on the right-hand said of the closet, there was a small table or drawer set, and that's where the fingerprint safe was.  On the left-hand side of the closet, so across from that, there were two safes

stacked on top of each other and those were both key access.

THE COURT: Thank you.

A        Yes, sir.

Q    (By Mr. Simko) Not knowing the answer to this question, I'll ask it.  Do you have an opinion, sometimes there's a closet married couples share, one seems to be female and one seems male.  Do you have an opinion, I don't know, about what side maybe goes to which person?

A        I do not.

Q        Okay.

A        They were clearly on opposite sides of the small room.

Q        Okay.

THE COURT: You didn't have an opportunity to see whose clothes were on one side versus the other or if they were mixed together or no real recollection?

A        I believe they were mixed because I believe there was like a pair of, potentially, a pair of female pants hanging on the left side, but I think it was mixed, but I can't say for certain.  I apologize.

THE COURT: Thank you.

Q    (By Mr. Simko) Now, were you able to examine the Glock firearm that was part of this case?

A        Yes.

Q        All right.  And can you tell the Court a little bit about the firearm, itself, any modifications to that firearm.

A        I recall the firearm having a distinct aftermarket grip on the handle of the gun.  There was also an aftermarket back plate, so the back of the firearm, there was a unique back plate to it.  And I believe the sights were also aftermarket, meaning, they would not have been on the firearm when it was initially purchased from the store or at least provided from Glock, the manufacturer.

Q        Okay.  And did you ask the defendant, Ms. Hutchinson, about the firearms, and was she able to provide you details about make, model, any of that aftermarket parts when you questioned her?

A        No.

Q        All right.  So she was not, when you asked her about make and model of the firearm, she was unaware as to make and model; is that right?

A        Correct.

Q        All right.  And then as to any of the modifications to these firearms, she was unaware of that as well?

A        Yes.

                MR. SIMKO:  Okay.  All right.  That's all I

have for now, Your Honor.

THE COURT:  Any questions from you, Merle?

MR. DECH:  Yes, Your Honor.  Thank you.

CROSS-EXAMINATION

- - -

BY MR. DECH:

Q        Agent, good morning.  Agent, the high capacity magazines, those are legal to purchase; is that correct?

A        Yes.

Q        And during the global pandemic, was there a buzz about social media of an ammunition shortage in this country, if you know?

A        I can't say one way or the other.

Q        Okay.  Did you ever hear about that in your duties as an ATF agent or in your capacity as a police officer?

A        I believe firearms and ammunition were in higher demand during the pandemic.  I believe that is accurate.

Q        Okay.

A        As far as social media and whatnot, I don't know how much.  I'm sorry.

Q        But they were in high demand during the pandemic, firearms and ammunition; is that correct?

A        I believe so, yes.

Q        Okay.  Thank you.  And this aftermarket grip, is

that legal to purchase?

A        Yes, it is.

Q        And can you just go to a gun shop and ask the person to modify it?

A        You can purchase it.  I'm not -- depending on where you go, they may or may not modify it for you.

Q        So you can just go to a gun store or gun dealer and purchase this modification for the grip?

A        Sure.

Q        And also for the back plate?

A        Yes.

Q        And also for the sights?

A        Yes.

Q        And the Beretta that was found with the obliterated serial number, did -- were any photographs or videos taken of Mr. Hutchinson possessing that Beretta at any time during your investigation?  Did you come upon that?

A        I don't believe -- I don't know if the firearm was a Beretta.

Q        Okay.  The firearm with the obliterated serial number, did you come into any photographs or any videos with Mr. Hutchinson possessing it?

A        No.

                 MR. DECH:  Okay.  Thank you.  No further

questions, Your Honor.

MR. SIMKO:  I don't have any redirect, Your Honor.

THE COURT:  I do.  A few questions, if I may.

Did you have any conversations with either Melissa or Richard Hutchinson about the guns located in the safe, either who did they belong to, what was the purpose for them, any conversation that might help me understand what role the guns in the safes might play in this case?

THE WITNESS:  Yes, on the date of the search warrant, when we interviewed Melissa Hutchinson, she stated that the firearms that were in the safe, I believe one of -- one of which, I'm not sure which one, I believe one of which she stated was a gift from her father and I believe she stated that she had purchased the other.

THE COURT:  The other guns?

THE WITNESS:  The -- there was two firearms. They were smaller, older-style pistols.

THE COURT:  What about all the magazines and ammunition?  It's quite a lengthy list that I'm looking at in paragraph 11 of the presentence report.  Maybe I should just show it to you so it might refresh your recollection. And I'm trying to get a handle on the purpose of what was found in the safes and for whose benefit they may have been

acquired. You see that list?

THE WITNESS: I do. Yes, sir.

THE COURT: Any help for me on any discussion you may have had with her about what she was doing with all of that or some of that?

THE WITNESS: She did not identify why she had it, but she was forefront with us when we interviewed her. She stated -- she informed us that there was a shotgun in the house, that these two pistols did exist. She did not deny it. She didn't provide, to my recollection, anything about the magazines or the amount of ammunition.

THE COURT: You discussed what was on his side of the bed, namely, the shotgun and the bag with the loaded magazine. What about her side of the bed? Was there anything on her night stand or in the vicinity?

THE WITNESS: I believe the only thing that was recovered on that side that we identified as her side of the bed was a cell phone belonging to her. I can check my report and tell you what was located where in the bedroom.

THE COURT: Sure.

THE WITNESS: If that would help you?

THE COURT: Oh, yes.

THE WITNESS: Okay. Do you want me to hold

onto this?

THE COURT: Not unless you think you need it.

THE WITNESS: Okay. Thank you.

THE COURT: By the way, this indicates two cell phones were found. Were those in the safes, the two cell phones listed in paragraph 11?

THE WITNESS: No, I don't believe the cell phones were in the safes.

So when we execute a search warrant, we label rooms by letters for obvious organizational purposes. So the bedroom there was labeled as room F. So in room F, we had one Glock magazine that was recovered under a night stand, and that would have been the side that we identified as Richard Hutchinson's side. That -- that magazine would have been loaded with 12 rounds of 9mm ammunition, so that, obviously, was on that side of the bed, that side of the room.

There was also one box of, it's H-O-R-N-A-D-Y critical defense .410 caliber ammunition, and that box contained 19 rounds that was also located underneath the bed on that side. That is the same side that the H&R model Pardner 410-gauge shotgun bearing the serial number HY261189 was located. It was loaded with one round of .410 caliber ammunition at the time that it was

recovered.

And then there was a black Apple iPhone I have identified in our report as being -- belonging to Ms. Melissa Hutchinson. And then there was a black Apple iPhone belonging to Richard Hutchinson that was also located. I do not have identified on the report which sides those phones were on, but I believe that that's how we determined them at the time of the search warrant. And that's all that we have as far as located underneath the bed or next to the bed, so.

I have the walk-in closet identified as a separate room, so I could provide you what was located in there, but that's why I didn't read it off as part of the identifying ledger.

THE COURT: Paragraph 11, which I showed you from the presentence report, list the items seized, and it identifies some of them as being inside the biometric safe, which we've heard you talk about. Some others are inside a Sentry, S-E-N-T-R-Y, safe. Were the other two safes both Sentrys that had the key?

THE WITNESS: Yes.

THE COURT: So it doesn't break it out. Then there's some items listed -- I guess I'm going to give this back to you -- that have no reference to a safe. And I'm not sure whether those were all in the safe. Or you'll

notice a box containing .410 caliber ammunition, two different boxes, 12 rounds, et cetera, spent casings, there is no reference to safe. Were those outside the safes, inside the closet, by the bed, any notion?

THE WITNESS: We identified room D in the apartment and it was a separate bedroom. It appeared to be utilized as an office, as an office space, and in that, it wasn't secured, it was common space. We located one box of critical defense .410 ammunition containing 20 rounds in that room. We located four assorted make and caliber spent shell casings were recovered in the desk drawer in that room. And we also recovered one round of Smith & Wesson .32 caliber ammunition located in the desk drawer of that room, also.

THE COURT: So we have the three safes, we have bed stand, we have a closet. Well, the safes were in the closet. There was nothing in the closet that was outside the safe that you seized by way of ammunition or guns, was that right?

THE WITNESS: Not inside the closet.

THE COURT: Right, but you have this other room, which you call room D, where else in the house do we have any guns or ammunition, if any?

THE WITNESS: I believe that's it.

THE COURT: That's all I have. If either of

you have any questions you want to follow-up with, given my questions, you may.

- - -

REDIRECT EXAMINATION

BY MR. SIMKO:

Q        So agent, not really about the items in the house, but you were asked about the purpose of some of these items.  Can you describe the neighborhood that Hutchinsons were living at when you guys executed the search warrant?  Did it appear high crime area, low crime area?  What can you tell us?

A        From my experience as a law enforcement officer, I didn't identify the area as a high crime area.

Prior to us executing the search warrant, we made contact with the property management company, who was very accommodating, and they were concerned about what was -- why we were on their property inquiring, and the manager actually informed me that when she had taken over several years prior, she had some issues with the place and they had finally, you know, moved these residents out, so she hadn't had any issues in several -- in a while.

MR. SIMKO:  All right.  Nothing further, Your Honor.

THE COURT:  Thank you.  You may step down.

THE WITNESS:  Thank you, sir.

THE COURT:  Anything else the government wishes to offer?

MR. SIMKO:  No.  My only witness, Your Honor.

THE COURT:  Anything defense wishes to offer at this point that we are discussing?

MR. DECH:  Yes, Your Honor.  We would call Ms. Melissa Hutchinson to the stand, Your Honor.

- - -

Thereupon, the Defendant, in order to maintain the issues on their part to be maintained, called as a witness,

MELISSA HUTCHINSON,

who, having been duly sworn as provided by law, testified and said as follows:

- - -

THE COURT:  It appears Mr. Hutchinson is in the courtroom, and I'm going to ask Mr. Hutchinson that you leave the courtroom during this testimony.  Your lawyer is present, as I see as well.  We will call you back in as soon as her testimony is completed.

MR. HUTCHINSON:  Yes, Your Honor.

THE COURT:  Thank you.

MR. HUTCHINSON:  You're welcome.

MR. DECH:  Thank you, Your Honor.

- - -

DIRECT EXAMINATION

BY MR. DECH:

Q        Ms. Hutchinson, I'd like to direct your attention to the day of February 14th, 2022.  Do you recall the agents of the ATF and other police agents entering your apartment?

A        Yes, I do.

Q        And on that date, did you have safes in your home?

A        Yes, I did.

Q        And how many safes did you have?

A        There were three.

Q        And was one of them known as a biometric safe?

A        Yes, that's correct.

Q        And what is that biometric safe?

A        There is an option for a key, but it is mainly for -- you have to program your fingerprint into it to open it.

Q        And did you program your fingerprint to open the biometric safe?

A        Yes, I did.

Q        And who had access to that safe?

A        Just myself.

Q        Was your husband able to enter that safe with a key?

A          No.

Q          And to the best of your knowledge, did he, himself, ever enter that safe?

A          No.

Q          Now inside that safe, did you have any firearms?

A          Yes.

Q          What firearms did you have?

A          There were two in there.  One was a gun that my father gave me and then the other one was one that I -- I was given.

Q          And the one that you were given by your father, is that an army Galesi-Brescia Brevetto?

A          Yes.

Q          Okay.  And when did you receive that firearm from your father?

A          It was in late 2020 after he had passed.  My father had passed in June of 2020.

Q          And you received that as a bequest from your father's estate?

A          Yes.

Q          And had that firearm, the Brevetto, always remained in the safe?

A          Yes.

Q          Did you ever use it for anything?

A          No.

Q        Also the Iver Johnson, that would be a revolver?

A        Yes.

Q        And how did you come about that?

A        That was given to me by a friend.

Q        And was that in the biometric safe?

A        Yes.

Q        And did you use that at any time?

A        No.

Q        I'd like to direct your attention to the Glock 9mm that you pawned to the pawn shop. I believe it was Cashland?

A        Yes.

Q        And did you make any alterations to that Glock?

A        Yes.

Q        What did you do?

A        I added a grip and the sights.

Q        Okay. And why did you change the grip on the firearm?

A        I simply changed the grip just to make it more comfortable for myself to handle. I am left-handed, so I have the issue of not being able to properly handle things.

Q        And the sights, why did you alter those?

A        Just for better accuracy.

Q        And found inside, there was a Sentry safe, also?

A        Yes.

Q        And inside that safe, there were --

THE COURT:  There were two?

MR. DECH:  Two sets of safes, yes.

Q   (By Mr. Dech) Inside one of the Sentry safes, there was ammunition, 9mm magazines?

A        Yes.

Q        And they've been referred to as high capacity magazines; did you purchase those?

A        Yes.

Q        And why did you purchase those?

A        I purchased those at the time when the con -- pandemic was just kind of getting underway.  It was only a matter of what was available at the time.

Q        And also, in the additional Sentry safe, there was Winchester and Sig Sauer ammunition.  Was that ammunition that you could use in the Glock?

A        Yes.

Q        Okay.  It was of the same millimeter, the same caliber?

A        Yes.

Q        Now on the obliterated, did you know the serial number was obliterated?

A        No.

Q        How often did you look at this firearm?

A        Very rarely.  Only times when I was thinking

about my dad and his times in the army.

Q        Okay.  Thank you.

MR. DECH:  I have no further questions, Your Honor.  Thank you.

THE COURT:  Cross examine.

MR. SIMKO:  Just a little bit.

- - -

CROSS EXAMINATION

BY MR. SIMKO:

Q        So you said that -- when did you come into possession of the firearm with the obliterated serial number?

A        Which one?  Because I know there wasn't one on my father's either.

Q        The one with the obliterated serial number?

A        Oh, the one, I'm sorry, that was around August or September of 2021.

Q        Okay.  And you said you took it out when you thought of him or something to that effect?

A        Yes.

Q        All right.  Is it big, small, what is it?

A        Small.

Q        Small, okay.  And you said you never noticed that the firearm serial number was obliterated?

A        No.

Q        Okay.  Can I show you a picture?  This will be --
I'll show you what's been marked as Government Exhibit 1.
Can you take a look at that?  You can clearly see in that
circled area that that -- there is scratches and all of
that other stuff there; is that correct?

A        Yes.

Q        Okay.  That would be clearly visible to you if
you were handling the firearm?  It's not big you said?

A        Right, right.

Q        And it's your testimony that you never noticed
that before handling the firearm?

A        Correct.

Q        Okay.  And I've got additional copies as well.
All right.  You said that -- when did you originally
purchase the Glock firearm?

A        The Glock was purchased in September of 2021.

Q        Okay.  And so where did you buy it, first-off?

A        Towers Armory.

Q        Okay.  And it didn't come with all those
aftermarket parts, right?

A        Right, that's correct.

Q        And when did you purchase the aftermarket parts?

A        Sometime thereafter, I would say within weeks,
maybe months after I had the firearm.

Q        Okay.  Months, well you didn't have the firearm

for too many months, so how many?

A        Maybe two.

Q        All right.  Within two.  So you purchased it --
when did you say?

A        September.

Q        All right.

A        Of 2021.

Q        September, October, November, so maybe as late as
November?

A        Correct.

Q        All right.  And then you altered the firearm?

A        No, I personally did not, no.

Q        All right.  Who did you give it to to alter?

A        There is a place that's called Goons Guns that's
in Michigan just over the line.  And I had them put those
moderations on there.

Q        All right.

A        Modifications, I'm sorry.

Q        Where did you -- did you get -- I'm sorry.  Did
you say where you got the aftermarket parts?

A        No, I did not.

Q        All right.  Where did you get them?

A        Amazon.

Q        Amazon?

A        Yes.

Q        All right.  So you would have had to pay for it with a credit card?

A        Correct.

Q        Okay.  So if we were to get the business records after the sentencing hearing, it's going to have your credit cards taxed to aftermarket parts; is that right?

A        Yes.

Q        All right.  And what were the aftermarket parts again?

A        There was the grip and the sight laser that was on top.

Q        All right.  Nothing else?

A        No.

Q        All right.  Because the agent testified about three modifications?

A        Okay.

Q        So you just got the two, though?

A        Correct.

Q        All right.  So what happened about the third?

A        I, honestly, I just -- I don't remember the third modification on there.  I remember the two, especially the grip again for my hand and sights.

Q        Can you describe them a little bit more, more specifically?  Any unique characteristics about those things?

A        No.  I mean, the grip was, obviously, for me to handle the gun properly, for it to be more comfortable in my hand, and the sights were, obviously, for to help aim better.

Q        Any designs on them that were unique?

A        No.

Q        Okay.  Just one moment.  All right.  We heard testimony about your house, right?

A        Correct.

Q        Well, first you said you had the biometric safe, right?

A        Correct.

Q        And that has a -- you can use a key for that, right?

A        Yes.

Q        Okay.  And so where is the key?

A        I'm pretty sure I have possession of it because I had it with the Sentry safes, the two other safes.  I had those keys together.

Q        Okay.  And those were in where?

A        The keys I had hidden in the apartment.

Q        Okay.  So they were in your house, right?

A        Correct.

Q        So the key to open the biometric safe is also in your house, correct?

A        Correct.

Q        And the keys for the other safes is in your house, correct?

A        Correct.

Q        In the house that Richard Hutchinson lives in, correct?

A        Correct.

Q        All right.  Now you would go to the pawn shop, correct?

A        Correct.

Q        And you would purchase firearms, correct?

A        Correct.  I purchased one, yes.

Q        Okay.  And pawned some, correct?

A        Yes.

Q        Okay.

A        I pawned one, yes.

Q        Okay.  And how did you decide which guns you were going to get?

A        I always wanted a shotgun, something that would, again, simply for home defense.  The Glock was a good price at the time.  Again, I purchased that from Towers Armory and that's what I decided to get --

Q        Okay.

A        -- to purchase.

Q        Now when you talked earlier at your sentencing,

I'm sorry, your plea hearing, you mentioned another gun, too, right?

A          Correct, the shotgun.

Q          No, a Ruger or another handgun that you had earlier in time; do you remember that?

A          No, I do not.

Q          You only had the Glock, the shotgun and what else?

A          I had the Glock, the shotgun, the gun my dad gave me and then the other gun that was given to me.

Q          Okay.  Are those the only firearms that you ever owned in your life?

A          Yes.

Q          Okay.  There wasn't another gun you purchased earlier in the year or earlier in the fall?

A          There was another gun I purchased earlier in the year.

Q          Okay, fifth gun?

A          Yes.

Q          Now five?

A          Yes.

Q          Okay.  Those other two guns that you are on video handing to your husband, the felon, right?

A          Correct.  Yes.

Q          Those were in his possession, right?

A        Yes.

Q        All right.  Did you ever give him -- well, what was the other gun, the fifth gun?

A        I don't remember.  I did not have it that long.

Q        Okay.

A        And I did resell it.

Q        Okay.  So you don't even remember that gun; is that correct?

A        No.

Q        Okay.  Did you ever give that to your husband?

A        No.

Q        Okay.  Not like you gave these other two, right?

A        No.

Q        Okay.  Now when you were interviewed by the agent at the time of the search warrant, do you remember interviewing with him?

A        Yes.

Q        And do you remember him talking to you about the firearms?

A        Yes.

Q        And do you remember the fact that you couldn't identify, just like that one earlier you mentioned, anything about the firearms; do you remember that?

A        Yes.

Q        Okay.  But now you've reviewed discovery, you've

seen the search warrants, the serial numbers, the make and models, now you remember them; is that correct?

A        No, that's not correct.

Q        You don't remember them now?

A        No -- I remember them, but, at the time, I did not, no.  It was 6 a.m. in the morning, being woken up by cops and everything else in my apartment, so no, I was frazzled, yes.

Q        Okay.  But you couldn't remember make, model, anything like that?

A        No.

Q        All right.  Now when they talked about -- agent talked about which side of the bed you guys slept on, he was correct, wasn't he?

A        Yes.

Q        All right.  So the shotgun was on Richard's side, correct?

A        Correct.

Q        And the ammunition was on Richard's side, correct?

A        Correct.

Q        Okay.  And what about the spent shells in the other room?  Did you guys go out shooting?

A        I did.

Q        You did?

A        Yes.

Q        He never shot this gun, is that what you are telling us?

A        No.

Q        Okay.  Where did you shoot it?

A        Towers Armory.

Q        Okay.

A        They have lanes where you can practice.

Q        Okay.  And did he go with you?

A        Yes.

Q        All right.  But he didn't shoot is what you are saying?

A        No, he did not.

Q        Okay.  So you know they've got video there --

A        Correct.

Q        -- in the shooting ranges?  When we review that, there is not going to be any footage of him shooting that gun?

A        No.

Q        Okay.  Do you remember approximately when you went with him to the shooting range?

A        No.  It was the end of 2021, after I had purchased the gun from Towers Armory, but I don't remember an exact date of when I went.

Q        Okay.

THE COURT:  How often did you go?

A        I believe I went a total of only two times.  I mean, two times.

THE COURT:  I heard you.  At the end of 2021 or the beginning of 2022.  Did you have a general recollection?  Was it November, December, January, was there snow on the ground?

A        No, it was -- it was more of October to November of 2021.

Q    (By Mr. Simko) With the shotgun?

A        I'm sorry?

Q    (By Mr. Simko) With the shotgun?

A        No, with -- with the Glock.

Q        So you went shooting with the Glock as well?

A        Just the Glock, not the shotgun, no.

Q        Okay.  But you just said all those spent casings in the other room, that was from the -- the firing range or where were you shooting at?

A        From the shotgun, I would go to like an empty field to shoot.

Q        Where?

A        Just up in Michigan where there was wide open spaces.

Q        But where?  I mean, you had to go somewhere specific?

A         No.  No, there was -- no, there wasn't like a specific, like a --

Q         You just pulled off the side of the highway and started cranking the gun off?

A         No, I mean, I wasn't doing that, but if there was like a wide open space, it would be late at night, that's when I would practice.

Q         Late at night, you would go up to Michigan at some unknown place to just discharge this gun for no reason in a field?

A         Not for unknown reason.  To practice.

Q         Okay.  What were you practicing?  You had targets?

A         No, just getting a feel for the gun.  I had never shot a shotgun before.

Q         Okay.

          THE COURT:  You were all by yourself when you did this?

A         Yes.

          THE COURT:  No one was with you?

A         No.

          THE COURT:  How often did you do this?

A         That was maybe twice.

          THE COURT:  Same time period?

A         Yes.

Q    (By Mr. Simko) And again, when you, I guess when we were talking earlier about the shotgun, I thought we were talking about the shotgun but I -- I guess we were talking about the Glock.  You would go to Towers Armory with the Glock with your husband, the felon, to shoot the gun?

A        Yes.

Q        Now you've testified that the firearms you had in your house were for protection; is that right?

A        Yes.

Q        Okay.  And you said you got the gun with the obliterated serial number earlier in the fall, '21, right?

A        Yes.

Q        And the other, the revolver, when did you get that?

A        That was early 2021.

Q        All right.  And you said you got it as a gift?

A        Yes.

Q        All right.  Who did you get it from?

A        A friend.

Q        More specific?

A        I believe his first name was Dominic.  Dominic -- I'm sorry, Dominic.  I don't remember his last name.

Q        Well, can you describe the circumstances?  It's a little strange you would get a firearm from someone you don't know their name, at least the last name --

A          Right.

Q          -- as a gift?

A          He was a friend of my husband's.  They grew up together.  I only generally knew him from that.  We didn't grow up together or anything like that.  Personally, him and I did not.

Q          So he's a friend of your husband's, right, and he's giving you a gift of a gun?

A          Yes.

Q          All right.  But he didn't give it to your husband, his friend?

A          No.

Q          Okay.  Now your husband, he has a drug addiction, right?

A          Yes.

Q          All right.  How long has he had that drug addiction?

A          As long as I've known him, which has been almost nine years.

Q          Okay.  So you've known him nine years.  Did you know him or were you guys involved when he went to prison?

A          Yes.

Q          All right.  So you knew that he was a felon, right?

A          Yes.

Q        Okay.  And you knew he went to prison for robbery?

A        Correct.

Q        Okay.  And eventually he gets out, right, and he gets into Drug Court, right?

A        Correct.

Q        And he has some mishaps, right?

A        Yes.

Q        All right.  And was that around the time this friend, Dominic, of who we don't know their last name, gave you a gun as a present?

A        No, that was sometime thereafter.  He, my husband, was in the Drug Court program July of 2018 is when he started with the Drug Court program.

Q        All right.  When did he get out?

A        He graduated from the program March of 2020, beginning of March.

Q        All right.  And then less than a year later, one of his buddies of whom you don't know their last name gave you a gun?

A        Correct.

Q        Now you said you needed these guns for protection, right?

A        Yes.

Q        But you had two guns, you had a revolver and you

had an army gun here that you could use those for protection. Why do you need all these extra guns? Why do you need a single shotgun? Sorry to interrupt you. Go ahead.

A        The single shotgun I purchased because we pawned the Glock because we needed that for money.

Q        But you had two other guns?

A        Correct. I never had any intention of shooting those, especially the one my father gave me. Those were never for protection. Those were strictly because I wanted those and my dad gave me the one.

Q        Gave you the one?

A        Yes.

Q        But you now have his revolver, right? You got a gift from Dominic, last name unknown, right?

A        Yes.

Q        It takes bullets, you could shoot someone with it, right?

A        Correct.

Q        You could shoot an intruder with it, correct?

A        Correct.

Q        All right. So why do you have to go out and buy more guns then?

A        Again, I never had any intention of shooting either of those guns.

Q        Right, but you said you needed money, right? That's why you pawned the Glock in the end?

A        Correct, yes.

Q        Right.  And you had more guns?

A        Correct.

Q        I get that you didn't -- you are saying here that, well, did it just not occur to you that this gun could be used for protection as well?

A        It -- it did occur to me, but I, again, I did not want to use either of those guns.

Q        Okay.  Now how many Glock magazines did you buy for these guns?  How many high capacity Glock magazines did you buy?

A        That, I don't remember.

Q        You don't remember that either, okay.  And they were high capacity because there was a shortage of ammo?

A        They were high -- it was hard to find.  I'm not sure I would define as a shortage, but they were in high demand when I was purchasing ammunition or looking for ammunition.

Q        I'm sorry.  I don't understand.  You got higher capacity magazines because there was less ammunition around?

A        Correct.

Q        Well I don't understand that, but just hold on

just one moment.

A        Okay.

MR. SIMKO:  Your Honor, I don't have any further questions.  I do -- I did ask the agent to inquire about something specific on the firearm itself.  There is an agent at ATF now looking.  I can probably have that answer shortly, shortly by the end of this sentencing, so.

THE COURT:  That's fine.

I have a few questions for you, Ms. Hutchinson.  Did I hear you that you had keys to all three safes?

THE WITNESS:  Correct.

THE COURT:  And did I hear you say that you hid them?

THE WITNESS:  Yes.

THE COURT:  All three?

THE WITNESS:  Yes.

THE COURT:  Why?

THE WITNESS:  Because I knew my husband could not have access to those items.

THE COURT:  Do you know whether he had or was able to get into the Sentry safe with keys that he had or?

THE WITNESS:  No, I had just -- the Sentry safes came with two sets of keys.  I hid both sets of keys.

THE COURT: And when did you get those Sentry safes?

THE WITNESS: The one, I had for a while. I probably had it for four or five years before I used it. It was a Christmas present from my father. And then the other one I purchased for ammunition.

THE COURT: And so that one was purchased more recently, the one for ammunition?

THE WITNESS: Correct, yes.

THE COURT: When did you purchase that one? Roughly? 2021?

THE WITNESS: 2021, yes.

THE COURT: And what about the other safe that required your fingerprint? When did you get that one? Did you buy it?

THE WITNESS: Yes, I did. I purchased it from Office Max. I don't exactly remember when. It was in 2021, yes, but I don't have an exact date, no.

THE COURT: There is a lot of activity in 2021 with guns, ammunition, safes, all of that. All of those purchases or gifts were for home protection?

THE WITNESS: The two that were given to me were never -- I never used those. Never had any intention of using those.

THE COURT: I take it those were, well, the

one was sentimental value from your father?

THE WITNESS:  Correct.

THE COURT:  And the other one, what was special about it?

THE WITNESS:  The other one, it was, at the time, it was hard to find ammunition for it.

THE COURT:  Oh, so it was a practical reason why that one wasn't being used?

THE WITNESS:  Correct, yes.

THE COURT:  Okay.

THE WITNESS:  Yes, Your Honor.

THE COURT:  And so I come back to, I look at paragraph 11, the guns, ammunition and all of that, frankly, it looks like somebody's preparing for Armageddon or a war and yet you moved from a high crime area to a better area and you continue to purchase guns and ammunition.  I'm trying to understand what's going on?

THE WITNESS:  Where the raid was conducted, we had only lived there a few months.  I am not an Ohio native, so I did not know that was a lesser crime area. Just like when we moved onto Alvison, that was a higher crime area.  I did not know that at this time.

THE COURT:  Didn't make any inquiry about where you were moving or what kind of place it was or talk to anyone about that, you just took your three -- three

safety deposit boxes and your guns and you moved without inquiry? You were trying to get away from the crime, right?

THE WITNESS: Correct, yes.

THE COURT: And you thought you were getting away from the crime, right?

THE WITNESS: Yes. Yes, I did. But I was -- was still fearful there were incidents that happened when we lived on Alvison that were not explained that --

THE COURT: So did you think somebody was after you or your husband or somebody had a reason to commit violence against you or your husband?

THE WITNESS: I, personally, no. I never had any, any reason to believe there would be some sort of retaliation, anything like that.

THE COURT: What about him?

THE WITNESS: I can't -- I can't answer for him.

THE COURT: Oh, come on. Sure you can. You are married to him. He's got a shotgun under his bed sleeping right next to you. Clearly, you must have had some discussion with him. You are pawning guns with him and handing them to him. Come on. Help me out here. Get me a little clarity on the relationship between him and you and all of these guns and ammunition.

THE WITNESS: For him, he was more worried about -- about the pandemic and all the unanswered questions. I was not necessarily worried about the pandemic. It was, for me, it was all about the home protection. Because again, what happened on Alvison was never explained. We did file a police report, but that was never explained, the damage that was done to my car, not once, but twice. And then the damage that the property that we lived at, the home that we lived at, that was never explained. Again, we did file a police report, but that was never -- there was no -- neither of us had any reason, especially not me, had any reason to believe or suspect that somebody would do that.

THE COURT: Did you find out whether they were trying to steal something and maybe it was in the car?

THE WITNESS: No.

THE COURT: Don't know?

THE WITNESS: No. Simply the damage that was done to my car was the back windshield was shot out twice. And then that was with a BB gun that we later found out when the police did come out, and that was the same damage that was done to -- we had a large screened-in porch at our residence on Alvison, and there were some marks on the glass of where they were like shooting at the windows.

THE COURT: Why is Dominic giving you a gun

as a gift?  Gift for what?  You didn't need another gun.

THE WITNESS:  No.

THE COURT:  Right?

THE WITNESS:  No, no, no.

THE COURT:  Why?  Is it an anniversary, birthday, help me out here.  Just giving you a gun?

THE WITNESS:  I commented that I liked the gun.  He had other guns at his home and I had commented that it was -- it was different.  It was something that I personally had never seen.  And he had other guns and he said, hey, you know, I'll give it to you.

THE COURT:  That's all I have.  I'll allow counsel to inquire further, if they wish.

MR. DECH:  No, actually my questions were asked by you, Your Honor.  Thank you.

MR. SIMKO:  Your Honor, I did have that question of the agent.  I was able to solve it, if I can call him in rebuttal?

THE COURT:  Sure.  I'm going to have her step down.

MR. SIMKO:  Sure.

THE COURT:  You can stay right where you are if you want to testify from there.  Just pull the mic.

You may step down, thank you.

Pull the microphone towards you.  You are

still under oath.  You may inquire.

- - -

FURTHER REDIRECT EXAMINATION (of Agent Steve McGrath)

BY MR. SIMKO:

Q        So two things, agent.  You heard Ms. Hutchinson tell you that she purchased this Glock firearm from Towers Armory.  That is true; is that correct?

A        Can you --

Q        I'm sorry, is it true she did purchase the firearm from Towers Armory; is that correct?

A        Yes, the firearm was originally purchased -- the Glock firearm was originally purchased from Towers Armory.

Q        Right, but when you inquired of her at the time of the search, she had a different story prior to reviewing discovery and all of that.  Where did she tell you she purchased this Glock firearm at the time of the search?

A        She had stated that she purchased the firearm from Vance's.

THE COURT:  I'm sorry, you got to get closer to the mic.  There is noise out the window.

A        I'm sorry.  Is this better?

THE COURT:  Yes.  Thank you.

A        Melissa Hutchinson, upon interviewing her the day of the search warrant, she stated that she had purchased the Glock firearm from Vance's Outdoor store in Columbus,

Ohio, that she had gone to with Richard Hutchinson.

Q    (By Mr. Simko) Okay.  And second, you heard me question Ms. Hutchinson about the details of this firearm, specifically, the modifications that were made to it; do you remember testimony?

A        Yes.

Q        All right.  And you heard me question her about the different modifications and whether or not any of those modifications had any unique characteristics; do you remember me asking that?

A        Yes.

Q        And do you remember she said she had no memory of any specific characteristics of those modifications, correct?

A        Correct.

Q        The back plate of this firearm or some modification to this firearm did have a specific characteristic; is that correct?

A        Yes, it does.

Q        And can you tell the Court what that unique characteristic was?

A        The back plate of the firearm, which is the back portion where the slide -- the back of the slide, essentially, is a white -- it's black.  The piece, itself, is black.  There is a white printed shamrock.

Q        All right.  Fairly large, fairly noticeable to anyone actually looking at this firearm in their hand; is that correct?

A        Yes, it's very noticeable.

MR. SIMKO:  All right.

Nothing further, Your Honor.

THE COURT:  Okay.  You've already stepped down.  Thank you.

Any further testimony or exhibits or evidence that either side wishes to bring to the Court's attention?

MR. SIMKO:  No, Your Honor.

MR. DECH:  One question of my client, Your Honor?

THE COURT:  Sure.

MR. DECH:  Thank you.

- - -

REDIRECT EXAMINATION (of Melissa Hutchinson)

BY MR. DECH:

Q        Ms. Hutchinson, you heard the agent testify that you told them you purchased the Glock from Vance Outdoors. Can you explain what you said or what it meant?

A        Yes.  At the time, I was confused.  Again, this was 6:30 in the morning.  The gun that I was referring to that I purchased from Vance Outdoor was not the Glock 19.

I was confused. That was the gun that I did -- I did purchase a gun from Vance, and I sold that gun. And I do have the documentation showing that I sold the gun.

THE COURT: Anything further?

Q (By Mr. Dech) Just -- we've heard reference as it relates to a back plate with a shamrock; do you recall that at all on the firearm?

A I do. Now that it's been brought to my attention, yes. But no, at first, no, I did not remember that detail, no.

MR. DECH: No further questions. Thank you, Judge.

THE COURT: So perhaps I can have counsel for both sides comment on what they've just heard and how they believe it might advance a ruling on the enhancement. I would like you to include in that what connection, not only the obliterated firearm, but all these firearms, might have to the charge in this case. Put it all together for me.

MR. SIMKO: Government first?

THE COURT: Sure.

MR. SIMKO: So, Your Honor, I think the defendant is not just charged with false identification -- essentially filling out the firearm falsely. That is sort of a vehicle to interrupting this type of conduct. The

more probably better descriptor is the other offense she is charged with, that is, providing firearms to a known felon. And, in this case, we have an example of the defendant providing two firearms on tape to the defendant.  So in two specific instances, her either buying a firearm and then handing it to the defendant, or pointing, rather, a firearm, or him bringing a firearm to her for which she pawns and then receives another one.  And they all go right to him.  That's on video.  And that's sort of what we know empirically, but the rest of the case has to be deduced through reason.

The defendant had multiple firearms in her house, a lot of ammunition, and the idea is that these firearms, just like the two on camera, were accessible to the defendant and, in fact, provided to the defendant either, A, by bringing them into the house, by buying ammunition or magazines, by going to the firearm range together.

And so the conduct that we are trying to punish here is providing firearms to a felon.  And whether it be the firearms in the biometric safe, which is also a key safe, so although we are calling it a biometric safe, that's only one way to open it.  There is another way as well.

THE COURT:  Can you open with the key and

not with the fingerprint?

MR. SIMKO: She testified to that.

THE COURT: Is that correct?

THE DEFENDANT: Yes.

THE COURT: Yes.

MR. SIMKO: And so I think when you take a look at this, all of this conduct comes into play, the firearm with the obliterated serial number, the revolver, the Pardner shotgun, the Glock, the other firearm or other two firearms -- I wasn't entirely sure there at the end if they were up to six, five or six firearms -- but this is all conduct of her providing firearms to a known felon.

Now she's known him for nine years. She's known him through his robbery with a firearm or it may have been a fake firearm at the time, but at least it was a robbery where a firearm appeared to be produced, and then knowing him as a drug addict and thinking this was a good idea.

She testified or I think the implication is that she'd hid these keys so as to be so careful as to not allow him access to these items, but then when she's on camera, not really thinking about it, clearly giving him guns, asking him to transport guns. Or him, probably more likely, probably sending her in there to get these guns for him. And he's really the masked mind behind it all, but I

don't think the Court should take it reasonably that she was so careful after the fact when no one was watching, but when everyone was watching, she clearly violated this law.

And I think when the Court looks to punishing this conduct, which is providing firearms to felons, all of this comes into play, the obliterated shotgun, and all the firearms.  I'm sorry, the obliterated serial number and all the shotguns -- or all the guns. Thank you.

THE COURT:  Merle?

MR. DECH:  Thank you, Judge.

Judge, I would first like to address the two firearms that are found in the biometric safe which Ms. Hutchinson has said that the keys were hidden and that she could only otherwise open it only with her fingerprint, which I believe she did at the time of the search.  We have a five shot revolver with a serial number which is inside the biometric safe.  We have no ammunition whatsoever found that could go to that firearm.  We have this Brevetto, which I mistakenly referred to as Beretta, which is a 6.35 caliber semiautomatic pistol, no ammunition, Your Honor. So that goes to the sentimental value of the Brevetto and to the non-use of the revolver.

Through all of this ammunition that is listed in the inventory, we have 9mm, which -- which would

go to the Glock, and we have a 12mm ammunition. We don't know what that goes to. And then we have .410 caliber ammunition. I believe, really, the relevant conduct should only go to the .410 shotgun and also to the Glock, Your Honor, which is seen on video.

I think that, otherwise, we are going to firearms that there is no ammunition whatsoever, and everything else, with the exception of the 12mm ammunition, goes to either the Glock or the .410, and we would ask the Court to find our objection well-taken and not give a four-level enhancement or other enhancements for what's found in the safe or in the home itself.

THE COURT: Thank you. Someone might let Mr. Hutchinson know he can come back in the courtroom. I think his counsel will. Thank you.

So let me address this in two parts, and the first part deals with Section 2K2.1(b)(4)(B), which calls for a four-level enhancement if a firearm had an altered or obliterated serial number. Relying on the authority set forth in my Order filed last week, I find there is no evidence this defendant was responsible or otherwise connected in any way with the obliteration. That takes care of one part of relevant conduct under Section 1B1.3, but for purposes of the enhancement itself under 2K2.1, I'm satisfied that that four-level enhancement does not apply.

Again, focused solely on the firearm with the obliterated serial number.

When I look to Section 3D1.2(d) and the discussion of conduct outside the offense of the conviction, what's called expanded relevant conduct under Section 1B1.(3)(a)(2), I look to, again, the guidelines and the total amount of harm or loss, the quantity of the substance involved or some other measure of aggregate harm including other guidelines.  And under that section, you look at the "who" and the "when" and other factors including 2K2.1, prohibited transactions involving firearms and ammunition.  And offenses may qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode or spree or ongoing series of offenses.  Among the factors include the degree of similarity to the other offenses, the regularity of the offenses, and the temporal proximity, that is, the time interval between the other offenses.

The government rightly notes that the indictment in this case is four counts, two counts dealing with false statement in connection with the purchase of a firearm, and two counts dealing with disposing of a firearm to a felon.  So while I'm not applying the four-level enhancement under the specifics, I certainly am going to

consider the totality of the conduct that I have heard and seen and that is set forth in the presentence report.

And what I've heard today answers some of the questions that I had with respect to paragraph 11, and we clearly had a period of time here where, Melissa, you, knowing your husband, knowing his record, collected, purchased, sold, pawned, received as gifts, a series of guns and ammunition of a significant amount. Very concerning to me. And when I try and relate that to the claim that we needed it for protection, it falls flat with me. This is something more than that. I accept the fact that you may have had the rear window of your car shot out with a BB gun, but to accumulate what I see in paragraph 11 in a response to that is a response that is more than necessary, doesn't meet the so-called need.

Driving by yourself up to Michigan with the shotgun and shooting in an open field, you don't know where, you don't know when, don't know -- I don't understand that, quite frankly. There are a few unanswered questions here, to be sure.

In any event, I'm going to, with respect to the guidelines, I'm going to grant the objection. I'm not going to apply the four-level enhancement, but, certainly, I believe its conduct I consider in arriving at an ultimate sentence in this case. Beyond the obliteration.

With that, I find the total offense level to be 12, the Criminal History Category of I with the guideline range of 10 to 16 months. I also find that the supervised release I believe would remain one to three years for Counts 2 and 3, and for Counts 5 and 6, the same.

And with respect to the statute on all of these counts, by statute, zero to ten years, and supervised release zero to three years. So that's the parameters that I have with respect to the guidelines and the statute.

Confirm for me, please, you've had an opportunity to review the presentence report, I've addressed any objection that either side may have had, and that my math, even if you disagree with the application, is nonetheless correct.

Start with the government, please.

MR. SIMKO: I believe that is correct, Your Honor.

MR. DECH: As do I, Your Honor.

THE COURT: Thank you, both. I want to confirm with you, Melissa, you had an opportunity to review this presentence report and discuss it with counsel, correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: That report will remain filed under seal and available as necessary.

By the way, I want to make one, I think, typo correction. The addendum indicates there were objections filed on behalf of the government. I think, Amanda, you meant there were no objections?

PROBATION OFFICER: Correct, Your Honor.

THE COURT: Thank you. So that the record is clear, the government did not have objections and has no new objections brought forward today.

I think I've identified the filings that were made in addition to the presentence report.

So now we are here to discuss where the sentence might be with the guidelines that I have established. And we'll start with defense counsel. I'll have another conversation with Melissa, and then we'll hear from the government, please.

MR. DECH: If I may just have a second, Your Honor?

THE COURT: Sure.

MR. DECH: Judge, may it please the Court: I think one of the greatest things to look at in this case is the personal history and characteristics of my client. She's a high school graduate. She attended college. She was employed with TJX for a number of years, lost her job.

THE COURT: TJ Maxx.

MR. DECH: TJ Maxx, yes.

THE COURT: You never shop there, obviously?

MR. DECH: I used to a lot. I don't have -- they don't have my size. That's the main problem for me.

THE COURT: I'm not going there.

MR. DECH: Judge, she --

THE COURT: So she's educated. She has a good job. Why are we here?

MR. DECH: I think that she made a mistake, Your Honor. She had a misbelief for even just a second. He can't go near any firearms. She understands that. She has literally thrown away 17 years or --

THE DEFENDANT: Seventeen.

MR. DECH: Seventeen years at TJ Maxx.

THE DEFENDANT: TJX.

MR. DECH: TJX. She has thrown away 34 years of good living. She has no traffic tickets. She has no juvenile adjudications, no adult, she has a better traffic record than I do, Your Honor. I think even a Criminal History I would overstate it, because she has zero criminal history points.

THE COURT: So I often will say I can understand somebody who makes a mistake once and sometimes it's a whopper of a mistake. I view that differently than somebody who makes repeated mistakes. We have repeated mistakes here during a period of time. Repeated mistakes

that she admits she knew she shouldn't have been doing. It's a little different. I realize she may not have gotten a traffic ticket. She skipped. She skipped the misdemeanor and went right to the felony.

MR. DECH: She did. She did, Your Honor. And she realizes she lost a lot. She's without a job as a result of that. She's without income. She had to cash out her 401K to pay for bills. She lost a month of mental health treatment because of the fact she did not have insurance. But what did she do? Got right back in the job market. She started applying right away. She applied to Jeep. They offered her a job. Unfortunately, that's a hit-or-miss on hours. Some weeks you might work 30 hours, you might not work 30 hours. So she took a job at the Amazon Fulfillment Center. She started yesterday. She went through orientation. She's back at the work force.

THE COURT: When did you start work there?

THE DEFENDANT: I actually started last night. I got off at 5 a.m. today and I did orientation. I will be actually figuring out where I'm working at today when I go in at 6:30. My scheduled shift is 6:30 p.m. to 5 a.m. Sunday, Monday, Tuesday, Wednesday and Thursday would be a mandatory workday for overtime, if required.

THE COURT: Do they understand you have this felony on your record?

THE DEFENDANT:  Yes.  Yes, I did disclose that during applying on my application, which was online.

THE COURT:  Good.  Go ahead.

MR. DECH:  It was TJ Maxx knew about the felony and she was able to maintain her employment until September, and she walked into work just before her 17th anniversary of employment and they terminated her as a result of that.

THE COURT:  For what reason, do you know?

MR. DECH:  For the felony, Your Honor.  They said they considered her to be a great risk or liability to the company.

So she's back in the work force.  She's done extremely well for 34 years.  I know she'll do well again. What we are asking for, Your Honor, is either a sentence -- one of three sentences:  Either a sentence of probation, she would do excellent on it.  She's complied completely with pretrial supervision.  She knows that there can be no contact by herself or by her husband to a firearm, to ammunition, none whatsoever.  Or a period -- or a period of home confinement for her.  Or, in the alternative, if the Court were to sentence her to imprisonment, a sentence of one day, credit for one day, with the most lengthy period of supervised release for her, which would be three years in this case.

I think she'll pass any of it with flying colors, Your Honor, and for that reason, we would ask for it.  And especially when you look at the cost options, Your Honor, for supervision versus imprisonment.

I think she'll do great on supervision. She'll follow through with the mental health treatment. She's locked with a great provider.  She's taking her medication.  The Court knows of her mental health history and, quite frankly, I think the next time we would see Ms. Hutchinson before this Court is when she completes supervision via probation or supervised release successfully.  Thank you.

THE COURT:  Thank you.

Let's hear from you.  Anything you wish to add to that, Melissa?

THE DEFENDANT:  Yes.  I --

THE COURT:  You can remain seated.

THE DEFENDANT:  Okay.

THE COURT:  If it's more comfortable.

THE DEFENDANT:  Okay.

THE COURT:  Just pull the microphone closer to you, please.

THE DEFENDANT:  Thank you, Your Honor.  I do want to mirror everything that my attorney just told me or just stated.

THE COURT:  Tell me something that he didn't state that you want me to know while --

THE DEFENDANT:  I am a hard-working person. I have always had employment.  This last month of not having employment was -- was very difficult.  I love -- I love my job that I was at, and I was honest with them, and they did work with me.  And I was fired September 27th.  I was devastated by that.  I'm not going to lie.  I worked for the company for 17 years, and I really didn't know any other.  My identity was kind of wrapped up in the job.

My father and my grandfather instilled in me a work ethic.  I was not going to sit back and feel sorry for myself.  The first couple of days, obviously, were very hard, but I did get right back looking for jobs, connecting with Ohio unemployment, finding resources.

On September 29th, just two days after being fired, I went to Amazon to do some like pre-hiring, things that they required, drug tests, submitting paperwork, things of that nature.  That very next week, I did a -- what they call a dexterity test for Jeep, that was a requirement to get hired there, and I did complete that.  I was offered a job by Amazon and Jeep.  I was offered the position at Amazon first on October 9th, and the very next day, I was accepted at Jeep on October 10th.

THE COURT:  So I accept the fact that you

have been hard-working.  Tell me something I don't know.  And the record should reflect my error.  It's not TJ Maxx.  It is TJX, which is different.  And perhaps that action by them, and I have no comment on whether that was right or wrong, but I think perhaps since you've indicated it was somewhat devastating to you, it may reflect how serious this case is.

THE DEFENDANT:  Yes, that's correct, Your Honor.

THE COURT:  I suspect they looked at a bit of the underlying circumstances and the charges and whatever and --

THE DEFENDANT:  Correct.  They did ask paperwork and things for me and I provided that to them as soon as I could.

THE COURT:  Let me have you talk to me about this, because it hasn't been discussed yet.  I think a lot of life and a lot of the choices we make in life can resolve around the people that we are with, be it family, friends, neighbors or otherwise.  Are you surrounding yourself with good people?  Is Mr. Hutchinson, quite frankly, good for you and someone you should be around along with Dominic, whoever Dominic is, and anyone else?  Are you surrounding yourself with good people to help you make good choices?  The people at TJX I suspect were good

people to you?

THE DEFENDANT: Yes, Your Honor. Yeah, and --

THE COURT: I don't think the people at TJX would have led you into the path that brings us together today, at least from what I understand. So talk to me about good choices, good people, and where your mind is with all of that?

THE DEFENDANT: Yes. I do surround myself with good people. The problem is, yes, there's behavior that my husband, Richard Hutchinson, has engaged in that now most people, obviously, would consider bad. I don't want to moralize that, but, no, it's not good behavior. He has broken the law and I acknowledge that. And yes, there are people that I used to work with at TJX company and that I actually am in contact with, and it was really a judgment in error on my part.

Yes, I can surround myself with good people or quote-unquote bad people, but, ultimately, yes, the decision is always mine to make because I have freewill.

THE COURT: And I'm sorry. I didn't mean to interrupt. Go ahead.

THE DEFENDANT: But I do have to acknowledge that the responsibility, the laws that I broke, my actions, I am solely responsible for those. I can surround myself

with good people or quote-unquote bad people, but they are still my actions and I fully acknowledge that my actions were not good. I acknowledge that I did break the law.

THE COURT: And these actions were yours and his. I assume his that led you into these bad decisions?

THE DEFENDANT: Yes. Yes, with us being married, yes, of course his opinion does weigh on me. But I also do acknowledge that, especially before all of this happened, I did not consider myself to be a co-dependent person, and I now know that I am a co-dependent person meaning that I put his needs before mine. And I now know that that is something that needs to be corrected. That is something that I have talked to with the nurse practitioner that I see once a month, other than this month because I didn't have insurance, I couldn't afford it. But that is something that I am talking about with her and she has also encouraged me to get back into a program that's called Celebrate Recovery, which I was in before the pandemic. And I would go to Cedar Creek Church, the one that is on Sylvania and Douglas, and I would go there for regular meetings. I fully take it on myself that I stopped going even after they started back up again after the pandemic meeting again weekly.

I was mistaken in thinking that I could handle my issues on my own. And that is one of the reasons

that led me to be here today is that I do need help. I do need guidance. I do need to be surrounded by good people, but I also need to make those choices for myself. The other good people I would say I surround myself by is my family.

THE COURT: Were they aware of what you were up to that brings us together today?

THE DEFENDANT: No.

THE COURT: In the future, you might want to counsel with them before you make important decisions.

THE DEFENDANT: Yes. Yes, I fully agree. And it was very hard for me to even talk about this case and what was going on. Excuse me.

THE COURT: That's okay. Take a break.

Let me hear from the government, please.

MR. SIMKO: So, Judge, these cases, either one of two stories. Either, A, the defendant just merely was going about a legal activity and accidently handed something to someone for a few moments and then took it back and that's merely the conduct we are here today, right, which, in the case isn't legal, but at the same time, I could say I could give something to Agent McGrath, if I asked him to hold for a few moments, is not really all that concerning, even if it was a gun. Or the story is the defendant was buying firearms for her husband.

And I think she's all but telling you that's what she's doing without actually telling you that, right? She's saying I'm putting his needs before mine. His opinion weighs on me too much. Well what does that have anything to do with just merely handing something to somebody for just a few moments and then taking it back, which is the rest of her testimony, and that's all this was. And none of his opinion or his thoughts or his mental health has anything to do with that unless we conclude that that's what she was doing. She was buying firearms for her violent, drug-addicted felon husband.

Now other things suggested that was the case. She knows a little bit about these firearms, right? She tells you I'm the one who purchased this firearm at Towers Armory. Nope, that's not what she said at the time of the search. She said she went to Columbus and bought them. She said I'm the one who bought these aftermarket parts and I'm the one that had them put on there, but she can't even identify the most identifiable part about those aftermarket parts. She is the one that says I'm going to the firing range with my husband to crank off some rounds, but no, he didn't touch it. No, I'm going up to Michigan to some field somewhere that I can't identify in the darkness of night, you know, practicing discharging this shotgun. I'm getting a revolver from my drug-addicted

husband's friend for whom we only have a first name because I told him I just like one. And I think all of that tells a story of this is not merely I just handed her -- or him a gun for a moment and then took it back. No, I was providing firearms for my drug-addicted husband, for my husband with this violent background.

And why? Maybe he likes guns, right? As I think would probably be the case about how many they have, about the fact that it's underneath his bed, about why the Glock magazine is on his side of the bed, right? The ammunition is on his side of the bed. He's about ready to pop out and shoot somebody, right? And it's not unreasonable, when they are talking about the pandemic, to think, well, maybe your husband is kind of the way you hear some people on the news are getting antsy about all of this and I need a bunch of guns because the government is coming or some people I don't like are coming and I need a bunch of guns. And that's probably more of the real part of this story.

Now Toledo has a problem with guns just like a lot of other places. I told this Court in chambers that Miami I heard on Friday through a webinar is taking off 110 crime guns every month. But Toledo, I told the Court, was taking off more than 130 crime guns a month off of our streets. We are beating Miami with the amount of felons or

shooters and guns in their hands. And what did the defendant do? Did she that. She took guns and put them in the hands of a guy who has a drug addiction and who has a violent past. And that's how we get the number of homicides we have in this city. That's how we get the amount of shootings we have in this city. That's where that all comes from.

Now her past -- I mean, her record is clean because I told the Court it's inherent in the offense. You cannot be convicted of getting or buying a firearm for a felon unless you have no record. Every person who comes, every straw purchaser who comes before this Court is not going to have a criminal record. They are going to be a Criminal History, you know, I. And that's what this Court is always going to see. She is not unique in that offense, and it shouldn't be mitigation when it is inherent in the offense.

Her relationship with her husband, it's her husband, but it's all of these straw purchasers either have some sort of strong friendship with the felon or have a romantic relationship. And more of the latter, right? This is a girlfriend or a husband or, I'm sorry, a wife or a husband or boyfriend or girlfriend. It's all inherent in these offenses. It's not unique. This is not something that this Court should take in mitigation. The offense is

always going to be a person with no record having a relationship with a felon or an addict or some other prohibited person and providing them guns.  And then they go out and they shoot something up, right?

And oftentimes, you might even say it's better because the boyfriend -- I'm not a bad guy, I just can't do it.  I'm under 21 years of age or I have a rinky-dink felony.  No.  She knows he's a drug addict.  She knows he has a violent past and she knows that probably better than any girlfriend that comes in here buying a gun for some other felon and she did it anyways.

I think this Court needs to send a message.  The government is trying to go out and tell the rest of the community, tell boyfriends and girlfriends and husbands and wives don't do this.  Don't put guns in the hands of these people, and the only way we can do that through the criminal justice system is by deterrents, telling them there will be severe consequences.  Losing a job is not good, right?  It's not something they should want to happen, but it's not exactly the consequence we are trying to advertise out there.  If we go to the community and we say, hey, you buy your felon boyfriend a gun and, well, maybe you lose your job and you get home confinement or probation or something, you know what, some of those people in those situations are going to say, you know what, maybe

that's worth the risk.  It's difficult finding these cases and bringing them to the Court, so the chances you are going to get away with it are probably pretty good, and if you don't, well, the Court is going to give you probation. And that's -- I don't know how we sell that to the community as a deterrent.

But if the Court would give the defendant a prison sentence, that's something we can take out there. That's a billboard we can put on the side of the street. That is a sign we can hang at every gun location.  That's a social media message that we can give to the rest of the community that says don't do this.  And by giving her probation, by varying downward, the Court sends that message and I can't do anything about the next one.  But I can do it if you scare the girlfriend with no record that she is going to prison, too.

So for all of these reasons, we are asking you to impose a guideline sentence of incarceration 10 to 16 months.  Thank you.

THE COURT:  I appreciate the time of everyone today.  I'm going to ponder this case.  I'm going to continue the hearing.  I'd like counsel to check in with Laura before you leave and find a day to continue it. Let's say something, because of our schedule, about 30 days from now or so, and we will reconvene, and I may have more

questions for you then. But, in the interim, I want to give this some thought. I don't get a do-over on these. The Sixth Circuit has told us once that sentencing hearing ends, you can't go back and do something different, and so I've had some new information today that I would like to digest and have you come back again. I apologize for the inconvenience, but I want to get it right, and so I want the additional time to do so.

And, again, please see Laura.

With that, we are adjourned.

(Proceedings adjourned at 11:45 a.m.)

- - -

**C E R T I F I C A T E**

I, the undersigned, hereby certify that the above and foregoing is a true and accurate record of the proceedings held in the above-entitled matter prepared from my stenotype notes.

*/s/ Diana M. Ziegelhofer*_____11/29/2022__
Diana M. Ziegelhofer, RPR, RCR
Official Court Reporter
United States District Court
1716 Spielbusch Avenue, Suite 118
Toledo, Ohio 43604
419-213-5538