UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,                Case No. 3:22-CR-00079-JZ-1

          Plaintiff,
                                         Toledo, Ohio

     vs.
                                         **MONDAY, JANUARY 9, 2023**

RICHARD HUTCHINSON,

          Defendant.

- - - - -

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE JACK ZOUHARY
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        **MATTHEW D. SIMKO,**
                           *Assistant United States Attorney*

For the Defendant:         **CLAIRE R. CAHOON,**
                           **KRYSTEN E. BEECH,**
                           *Assistant Federal Public Defenders*

Official Court Reporter:   Diana M. Ziegelhofer, RPR, RCR
                           United States District Court
                           1716 Spielbusch Avenue, Suite 118
                           Toledo, Ohio  43604
                           (419) 213-5538

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

- - -

**MONDAY, JANUARY 9, 2023**

(Proceedings commenced in open court at 2:16 p.m.)

THE COURT:  We are here on case number 22CR79-01, the United States versus Richard Hutchinson. The defendant is present along with counsel, Claire Cahoon and Krysten Beech.  On behalf of the government, we have Matt Simko, and with him is Agent Steve McGrath.  We also have present our P.S.I. writer, Amanda Winner.

Defendant, by way of background, had an indictment filed against him in March of last year and he pled guilty to two counts, Counts 1 and 4, each charging the defendant with being a felon in possession of a firearm.  The defendant entered a guilty plea in August, and today we have our sentencing hearing scheduled.

For the record, I spoke with counsel briefly and prior to taking the bench and indicated for several reasons that I was likely to begin and then continue this sentencing to a later date that we discussed with counsel, but I would like to begin the hearing and understand that there may be some testimony that's going to be offered by the defendant or someone on the defendant's behalf and, therefore, we will begin the hearing today.

And let me start with defense counsel.  Do you have any witnesses you wish to offer?

MS. CAHOON:  We do, Your Honor.  We would like to call Dr. Jeffrey Wendt to speak to the issue of diminished capacity.

THE COURT:  Thank you.

- - -

Thereupon, the Defendant, in order to maintain the issues on their part to be maintained, called as a witness,

JEFFREY WENDT,

who, having been duly sworn as provided by law, testified and said as follows:

- - -

THE COURT:  Dr. Wendt, good afternoon.

THE WITNESS:  Good afternoon.

MS. CAHOON:  I'll remove my mask while we are chatting here.

THE COURT:  Only if you are comfortable, I'm going to ask you to remove your mask while you are giving testimony -- it will make it easier for the court reporter -- only if you are comfortable in doing so.  If you are not, you may, of course, keep it on.

THE WITNESS:  Yes, Your Honor.  Thank you.

THE COURT:  Thank you.

- - -

DIRECT EXAMINATION

BY MS. CAHOON:

Q        Dr. Wendt, could you share with the Court a little bit about your education and background.

A        Yes, my name is Dr. Jeffrey Wendt, J-E-F-F-R-E-Y W-E-N, D as in David, T as in Thomas.  I have a bachelor's degree in psychology from Hillsdale College, a master's degree in experimental psychology, and a Ph.D. in clinical psychology from Wayne State University in Detroit.  I worked for the Center for Forensic Psychiatry in Ann Arbor, Michigan, until 2006 as a forensic psychologist, and since that time, I've practiced forensic psychology in private practice exclusively doing evaluations of criminal defendants who have -- for a variety of different referral questions.

Q        And how did you come to get involved in this case?

A        I was contacted by defense counsel to conduct a psychological evaluation of Mr. Hutchinson to address diagnostic issues and what role they may have played in his prior conduct.

Q        What kinds of records and information did you receive prior to your evaluation?

A        Would it be all right if I referred to my report just to make sure I am not leaving anything out?

                THE COURT:  Absolutely.

THE WITNESS:  I have a list on here.

THE COURT:  And if you just want to reference your report, which I have in front of me, you can reference a page or an exhibit, that sort of thing.

A          Yes, Your Honor.

On the first page, I list that I have reviewed the indictment, criminal complaint, investigation reports, pretrial services reports and a variety of medical records from a list that's on the first page of hospitals and outpatient treatment centers.  And those were the primary sources of information that I had prior to the evaluation.

During the evaluation, Mr. Hutchinson provided me with some photographic and video information that was on his phone that he thought would be helpful for me to understand his history.

Q          And could you summarize for us the kinds of testing that you performed as a part of completing your evaluation.

A          Yes.  For this evaluation, I administered the personality assessment inventory, which is a self-report personality questionnaire that provides information about two main areas.  The first is validity scales that address the respondent's response style in terms of whether they are responding consistently to testing but also looks at

whether they are exaggerating or minimizing psychological problems.  The testing also identifies what psychological problems a person has and what severity those problems are. And testing is helpful in terms of comparing this individual to the general population in terms of normative scores and how severe his problems might be or not so severe on any different problem areas.  And so he completed that during our assessment appointment.

Q        You mentioned that the testing involves some scoring to make sure people aren't minimizing or maximizing, for lack of a better word, their symptoms.  Can you tell me a little bit more about how that works.

A        In the context of a forensic evaluation, there is often concern that a defendant might be exaggerating problems for a secondary gain or, in another context, minimizing problems for similar reasons.  So there are normative scores in testing that allow you to decide if there are signs that he may be exaggerating problems.

In this case, the validity scale showed that he responded in an open and honest manner.  It wasn't indicative of an invalid profile.  And once more, testing was consistent with the voluminous treatment records that I was presented with, also.  So I viewed this as an accurate representation of his true mental state.

Q        And what was your permission of Mr. Hutchinson's

willingness to engage in the evaluation process for you?

A        He was fully cooperative with the evaluation. Although his affect was somewhat flattening, that he was reserved, he was fully willing to discuss issues and topics, even ones that reflected poorly upon him in terms of substance use or prior illegal behavior.  And his representation of these historical events were consistent with what I had read in some of the discovery materials.

Q        So based on your evaluation and looking to your report, can you just outline for us what are Mr. Hutchinson's diagnoses?

A        Well, he has a variety of diagnoses in the past that include several, four primary categories.  He's been diagnosed with psychotic disorders in terms of delusional disorder, schizoaffective disorder, bipolar disorder with delusion with psychotic features.  So those all involve impairments in reality testing, bizarre or odd beliefs or perceptions.

He's also been diagnosed with mood disorders whether it's bipolar disorder or major depressive disorder. He's had significant problems with substance use, so he's been diagnosed with substance use disorders usually in the severe category, most consistently with opiates in terms of heroin or prescription pain medication.

But one of the most problematic diagnoses

that he's had is in the category of anxiety disorders. He's been diagnosed with generalized anxiety disorder, panic disorder with agoraphobia, obsessive compulsive disorders, all of which involve overwhelming symptoms of anxiety that interfere with his concentration and day-to-day function, particularly when the anxiety is coupled with potential paranoia from the psychosis.

So the diagnoses that I offered were three: The first was panic disorder with agoraphobia; the second was major depressive disorder recurrence with psychotic features; and the third was opiate use disorder, severe, in remission.

Q        And you started to explain panic disorder some, but can you just tell us a little bit more about what panic disorder is and how it's different from just general anxiety.

A        Panic disorder involves several symptoms, some of which are ruminative anxiety where a person has racing thoughts about a situation whether it's danger in the environment, problems that they have to solve, but it also involves physical symptoms.  And this is a primary thing that I saw on his treatment record that he would often experience these physical symptoms that were overwhelming where he thought he was having a heart attack or some other life or death physical health situation, and he would

present to the emergency department at the hospital over and over and over even though he repeatedly had been told this is an anxiety reaction, it's not a physical reaction, there is no indication of a heart attack or stroke or these other problems.  And so the panic reaction in his case was accompanied by a lack of insight in terms of even though he had been repeatedly told that this was not a heart attack, when the symptoms would reoccur, he would believe that this is something that needs to be treated in the emergency room.  And it happened repeatedly for at least the ten years' worth of records that I have.  Very frequently.

Q        When you were discussing Mr. Hutchinson's past diagnoses over the years, I think you mentioned a tendency towards unusual beliefs.  Can you talk a little bit about that.

A        His unusual beliefs have primarily been in the neighborhood of paranoid beliefs, thinking that people are out to get him, trying to harm him, following him.  And this was documented over and over again in the treatment record.  But the treatment record also referred to magical thinking, and that's something that's often seen in a person with a combination of anxiety and psychotic disorder where they become to believe in a sort of obsessive compulsive way that certain events have specific meaning toward them even if they might not, might be completely

unrelated.  They might think that certain behaviors that they have in terms of touching things or counting things have a magical effect on what's going to occur next.  And that was -- that was noted in the treatment record several times.

The other psychotic symptoms that he's had that were in there, there had been times where he reported auditory hallucinations and voices.  So it's primarily the paranoia, but also the secondary things, the magical thinking and the auditory hallucinations.

Q        And you said earlier that it's -- excuse me -- it's panic disorder with agoraphobia.  Could you explain the agoraphobia component.

A        Agoraphobia refers to fear of being in public situations where a person with this condition will, because of the fear of experiencing a panic attack in an environment where they are unsafe or unprepared, they will often stay in a place they feel is safe.  They might barricade themselves in their home or refuse to go out to supermarkets or shopping malls, for example.  So they are going to interact less with the environment that they perceive to be dangerous.

And in a lot of ways, this was coupled with his paranoia, because it led to behaviors that were supportive of the agoraphobia that appeared to -- arose to

the degree of delusional paranoia. He was installing cameras all over the different areas of his residence. He told me that he had installed very strong hinges and doors and things to make the house safer and bought a lot of extra locks, for example, with the perception that he always thought that someone was going to kick in the door or was following him or was intending to harm him and his family.

Q        You also talked about major depression with psychotic features. Can you tell us a little bit more about that and how that differs from other forms of depression.

A        I had some difficulty in terms of identifying the specific diagnosis in terms of where his psychosis would fit diagnostically, because it has been characterized as delusional disorder where the delusions stand alone apart from the mood. But he's also had the bipolar disorder with psychosis and schizoaffective disorder where the paranoia and delusions occur in the context of mood disorder, also, and what he described as chronic, depressed mood that has led to suicidal thoughts and suicidal behaviors in terms of cutting his wrists and overdosing with medication, and he's been hospitalized for these on a few occasions over the records that I had over ten years, so it was my impression that it was best characterized, because the major

depression is a major component of his psychological profile, that the psychosis would fit with that because it occurred increasingly.  When he was more depressed, he would become more out of touch with reality.  The psychosis would occur more, in my opinion, during episodes when he was extremely depressed and anxious.

Q        And based on your review of the records, how long do you believe Mr. Hutchinson has been suffering from these various disorders?

A        The primary documentation that I have really began in 2013 when he became eligible for social security disability for this, what they call the schizophrenic or psychotic disorder at that time, but those records also refer to prior suicidal behavior.  So it doesn't appear that that had just begun at that time, that this had been something that had been going on for at least several years before that.  But we have fervent and frequent documentation of it since 2013 up until -- I have records up through 2022.

Q        And I think you mentioned that you reviewed the social security disability records.  Do you recall how long Mr. Hutchinson was receiving disability as a result of some of these mental diagnoses that he was struggling with?

A        The way I read it, he first became eligible in 2013 and there was a need to reevaluate in 2017.  And then

in 2019, I believe he became eligible.  They determined that he remained eligible for the disability benefits for his mental health condition.

Q          And so you have records going back to 2013.  So based on your review, was Mr. Hutchinson suffering from these conditions in December of 2021 when these offenses occurred?

A          From his description and from the records that I have, it looks like these symptoms were still present and in some ways were more severe because of environmental factors that had been going on.  There was some disruption in his treatment due to, in early 2020, when the COVID-19 epidemic hit, he had missed some appointments, so the treatment provider referred him somewhere else, so he was without treatment for a period of time, but that also led to increasing isolation and problems with employment.  And he described perceptions that the world was falling apart, there was going to be lawlessness and lack of safety because of what he was seeing on the news, for example, in terms of riots.  So this heightened his paranoia and heightened his depressed mood.  And even though he was maintaining taking the medication for the most part, even the records that we have show that he's still continued to have some lack of contact with reality, severe anxiety and depressed mood.

Q        And with all of these conditions we've been discussing, during the pandemic and how isolated we all became during that period, what kind of effect do you think that that had on Mr. Hutchinson?

A        Well, it's my opinion that it intensified a lot of his symptoms in terms of his perception of what was happening in the world and what effect it had on him.  And, in addition, when I talked about some of the video and the pictures that he showed me, he had said that in his neighborhood and even in his house, there had been some shootings.  The window of his wife's car had been shot.  And he showed me pictures of bullet holes in the house and it was his house and his car and even the neighbors.  And one of the videos showed a flash of light from his security video.  It looked like a gunshot.  He thought of it as a gunshot.  It looked like that to me.

         So in addition to his overall high level of anxiety that was bordering on paranoia and frequently crossing into delusional paranoia, with these environmental factors, it exacerbated the problem, made things worse.  It made him talking about needing to build a bug-out bag and living in the woods because society was going to fall apart.  And he said that his frequent discussions about this had an effect on his family.  He would talk about it all the time.  He would talk about it to his wife and to

his mother. And he thinks some of that, those beliefs, rubbed off. And so it was an environment where it was bouncing these ideas off people in his family and it served to intensify the problem.

On top of this, in 2020, his depression worsened after his father-in-law and his cat died. He said that had triggered a lot of the depression. He had been abstinent from the opiates for a period of time since I think he said maybe 2017, but there had been a period of sobriety, but he relapsed with substance use during that time and was alternating between use of Percocet and then the Suboxone to get off the Percocet. He said he would go back and forth between those. So I think that that likely exacerbated the problem even more in terms of his contact with reality and his clear thinking.

Q        What connection do you think there is between the substance use disorder and some of these other conditions you had been discussing?

A        In the treatment records that I reviewed, and there was even information from testing that I thought was supportive of this, this looks like a situation where he used drugs as a form of self-medication where a person's overwhelmed with anxiety or depression and they resort to substance use for short-term relief of those problems and it develops into an addiction, which it did with him. He

said he began using marijuana in middle school and began using opiates back at age 17, so it's been a chronic problem, and he's had treatment for it, participated in Drug Court, had different times of withdrawal and detoxification, overdose, and so this has been a serious problem in his life.

But he's demonstrated, at least from the way I understand it, there's at least a five-year period of sobriety from 2017 -- 2012 to 2017 where he maintained employment for a period of time. So he's demonstrated the capacity for sobriety in the midst of this, but like I said, he relapsed in 2020 and was reportedly using around the time of these gun issues.

Q        So as you just noted, we are here because Mr. Hutchinson possessed firearms --

A        Excuse me, yes.

Q        -- in December of 2021. In looking at your report, at page 10 here, you state that you believe his mental illness, quote, significantly impaired his ability to control behavior that he knew was wrongful. Can you please explain why you reached that conclusion.

A        Yes. His mental health condition was characterized by impairments in reality testing, perceptions of danger above and beyond, even if he was in a dangerous environment, above and beyond what the

environment called for.  He said that he was aware that he was prohibited from having firearms, but he thought this was -- he perceived this as a life and death situation, as I described, society was falling apart.  He felt that somebody might kick in the door and, in some ways, the lesser of two evils.  He had called the police after he reported the shooting in the neighborhood and felt heightened danger after that, and there was no indication that the police would arrive in a timely manner if he were truly in a life or death situation.  And like I said, his mental illness is what made him perceive that it was a much more life and death situation than whether it was or whether it wasn't, in reality.

His paranoia was, in my estimation, delusional in proportion from time-to-time.  So even though he was aware that he couldn't do these things or couldn't possess these things, he thought that was the only choice available at that time.

Q        You noted in your report that Mr. Hutchinson does not have any kind of personality disorder.  Why is that significant?

A        In conducting this type of evaluation, one thing that often manifests is the presence of an antisocial personality disorder or psychopathy where a person engages in criminal behavior to take advantage of other people with

a lack of empathy and has an instrumental criminal behavior to take advantage of others. On the other hand, sometimes people engage in criminal behavior because they have substance addiction or are engaging in this behavior to fuel their addiction, for example. And Mr. Hutchinson's history was inconsistent with the finding of antisocial personality disorder. Testing was not indicative of this condition, and so that led me to believe that his criminal behavior is more of a manifestation of his addiction and his mental health condition rather than an overall criminal mindset.

Q       With the diagnoses you've identified and that we've been discussing here, what kind of treatment do you believe would be most effective for Mr. Hutchinson going forward from today?

A       I recommend that he participate in ongoing medication management on a consistent basis with, when I met with him, he was taking an antipsychotic medication, antidepressive medication and another for anxiety. There is some limitations on what anxiety medications can be prescribed while incarcerated, but wherever his placement is, it's my recommendation that the primary thing is stability in terms of his medication treatment, in combination with psychotherapy to be able to do exercises in reality testing and cognitive behavioral treatment to be

able to develop methods of coping with his symptoms that don't involve substance use or weapons use or behavior to address the paranoia rather than using the medication or using therapy.

Q        Dr. Wendt, for someone with Mr. Hutchinson's profile, do you believe a long period of incarceration would have an impact on recidivism or is treatment likely to be more effective?

A        Well, incarceration is going to keep him away from society, certainly.  I think in terms of his mental health condition and his addiction, he's going to require treatment no matter the placement and long-term treatment. But there are some specific factors of persons with agoraphobia and the intense paranoia that leave them less capable of coping with the stress of incarceration in terms of, you know, the perception of danger because, in some ways, it is a dangerous environment in terms of their control over their own personal space, in terms of loud and unpredictable noises and interactions with other people that they have limited control over.  A person with panic disorder with agoraphobia is extremely less capable of coping with that than the average adult would be.

                MS. CAHOON:  Thank you, Dr. Wendt.

                No further questions, Your Honor.

                THE COURT:  Government wish to question?

MR. SIMKO: Just a little bit, Your Honor.

CROSS-EXAMINATION

- - -

BY MR. SIMKO:

Q        Doctor, you've interviewed and spoke with Mr. Hutchinson, correct?

A        Yes, I did.

Q        And you said that what roles did the guns play alleviating or securing himself? What roles -- why did he need the guns?

A        From his description to me, it was due to his perception of danger in his environment.

Q        And so did he describe to you a little bit about what steps was he taking to protect himself? Was he out there practicing, was he getting ready for something to happen?

A        In some ways, yes. He told me that he had -- that he made those changes to his house in terms of the locks and the doors, the cameras. He said that he was making preparations for living out in the woods if it came to that and made a bug-out bag and was watching survival videos in case that became necessary. He said he had perception that the door would be kicked in, so he had bought specific braces to put under the door handle. I don't know -- he didn't talk about use of the firearms in

preparation, but just the possession to be ready if necessary.

Q        Did you guys talk about that?  Did you ask him what are you going out there doing?  Are you practicing, getting ready, out there shooting?

A        I don't recall asking him those things.

Q        Did he do anything else to get ready?  Training, exercises, learning new skills?  You said he planned to go outdoors and live there.  I would think that would need some amount of training?

A        Probably -- well, here's what I would say on that is I don't recall him talking about that, but he did say we stayed to the house as much as possible and that interfered with his, you know, holding the job and those kinds of things.  So what he did, for the most part, is remain in the house due to his perception of danger in the environment.  He didn't talk about any specific training outside of the house that I recall.

Q        Do you have a diagnosis of drug dependence or how do you phrase that?

A        The new, the DSM-5 now, they used to refer to as opioid dependence.  They call it opioid use disorder, severe.  That's the diagnosis that I gave to him.

Q        What role does that play in exacerbating some of these paranoid and other conditions that he has?

A          Well, drug use can increase your lack of contact with the environment. It can decrease your judgment, and it probably -- it probably did play those roles. Overuse of certain substances can lead to increasing paranoia, not necessarily the opioids as much, but some other substances. So that's something to take into consideration in terms of the diagnosis. But the diagnosis has been relatively consistent in terms of the categories that he's had even during periods of sobriety, so that's why I considered him in that area.

Q          But he did voluntarily, going out seeking, obtaining illegal narcotics and adjusting them?

A          I'm sorry, could you say that again?

Q          He is voluntarily going out, seeking, finding, buying illegal narcotics and adjusting them?

A          Yes, he said that although they are prescription drugs, they were not prescribed to him. He was buying them from the street.

Q          You also indicated he's -- true that he's received treatment from a number of facilities; is that right?

A          Yes.

Q          Yes. So he's had like -- he received psychological evaluations, he has a primary care physician, he's been to Comprehensive Behavioral Health, Rescue Mental

Health Crisis, Harbor, he's gone to UT Medical Center, Zepf Center, Unison, he's had an intensive outpatient program, Drug Court, so a judge actually getting involved in his treatment, he's been to Toledo Hospital, Flower Hospital, Mercy Hospital, and all of these places generally have a diagnosis for him and a treatment regimen; is that fair?

A    Are you referring to the -- to his substance use disorders?

Q    I'm thinking, well --

A    Or mental health?

Q    Both, I suppose.

A    For the most part, he's had all of those diagnoses, and throughout the time that I -- it would vary over time, but they were generally the diagnoses in those main categories that I described including the substance use disorders.

Q    But, ultimately, all of that diagnoses and treatment still led us to where we are here today?

A    Yes.

Q    You indicated I guess, lastly, that he had some awareness of his paranoia; is that right?

A    Well, I think that he had limited insight into the paranoia in a lot of ways.  In terms of the example that I gave about the physical health symptoms, he had poor awareness of that.  And also, his insight into whether his

paranoia was realistic -- and maybe some of it was -- or whether it was based in mental health condition, because he perceived all of it to be real.  And so I would say that he had limited insight into that, but he had some perception that he, obviously, felt he was in danger, but in perceiving it in terms of being paranoid, I think that was limited because he perceived it to be realistic.

Q        And being real, you indicated that he had conversations with his family about this; is that right?

A        That's what he told me.  I didn't speak to them directly, but that's what he told me about it.

Q        So you indicated that they were well-aware that he has these, based on at least his statements to you, they were certainly aware that he had these, if not -- I mean, paranoia or real, these feelings of what's going on in the world and why they needed to be concerned?

A        Correct.

Q        You were talking about whether or not you talked to his family about his drug usage?

A        I don't recall that.

Q        How bad was his drug usage?

A        Well, it had varied over time.  In the past, leading up to --

Q        I'll ask -- you can go ahead and answer, but my question is more around the time of this offense.

A        Okay.  Well, it had been severe in the past, and what he told me was that from somewhere in 2020 when he relapsed, it would vary in intensity because he would use the Percocets for a period of time but then switch to the Suboxone, the treatment to get off of the Percocets, but it is still in that class of drugs.  So it would be, it's my understanding, that it would wax and wane whether he was using the Percocets or the Suboxone, but it sounded as if it was relatively consistent and there were no periods of sustained sobriety in there.

Q        Did he tell you where he was getting he said prescription drugs, but where he was getting those drugs?

A        He said on the streets, buying it from people that he knew from past experience.

Q        And he said was there an event or events, the death of his cat, maybe you mentioned one more, that sort of set this off on a more aggressive, more aggressive set of events, his paranoia and drug use?

A        Well, what he described was that the death of his cat and the death of his father-in-law had occurred in 2020 and that made his depression worsen.  And he said that, in response to the increased depression, he had relapsed with the substance use.

Q        Do you know about when that was?  First half, second half of 2020?

A          I don't specifically recall.  I probably have it in my treatment record -- interview notes, but I don't recall.  He said sometime in 2020.  I'm not aware of a specific date.

Q          Okay.  Hold on one moment.

MR. SIMKO:  Nothing further, Your Honor.

THE COURT:  I have a few questions and then I'll let counsel for both sides follow-up as may be appropriate.

Did you review -- and, by the way, my question doesn't imply that you should have, okay.  Did you review or did anyone make available to you medical records for 2020, 2021 and 2022?

THE WITNESS:  Yes.

THE COURT:  And what, specifically, did you have that focused on those years?

THE WITNESS:  Some of the -- some of the records were from back in 2013, but the more recent ones, if it's all right if I look at my report?

THE COURT:  Of course.  This is not a memory quiz.

THE WITNESS:  Sounds good.  All right.  So Unison Health was 2018 and Mercy Health records were from 2019.  He went to treatment.  This was more as it was getting much closer to when the first gun was purchased.

So at the bottom of page 8, I described some records from Comprehensive Behavioral Health Service, and this is going back to October 28th of '21, so it's about two months before that first, first gun.  And they diagnosed him with anxiety disorder, panic and depression.  They talk a little bit about his history and he's having sleep disturbance, fatigue, irritability.  It describes some of the problems that he's having there, restlessness, frequent worry, difficulty relaxing.  And they call it generalized.  They actually diagnose him with three different anxiety disorders and major depressive disorder, but I think that the generalized anxiety disorder, social anxiety disorder and panic disorder with agoraphobia all fall into the same categories, so that's...

THE COURT:  So it sounds like you have nothing for 2020 and then the next report that you have is October of 2021?

THE WITNESS:  Well, that may be.  I have --

THE COURT:  Well do your notes reflect one way or the other?

THE WITNESS:  The records don't reflect that -- one of the treatment providers have 1300 pages of records, so sometimes I might not give every date that he had a contact, and with so many different treatment providers, I tended to focus on what I thought might be

pertinent to the one, you know, the appointments in October and December right before and right after the case. So if it's not referred to in here doesn't mean I didn't have those records because I brought -- this bag is full of it, but it doesn't even include the 1300 pages from one of the hospitals. So it's not an exhaustive list in my report, so even if it doesn't refer to a record in 2020, I'm not going to say that I don't have that, but it might not have been remarkable or add more than I had in terms of his history or functioning at that time.

THE COURT: I'm going to ask you to provide your -- not your counsel, but defense counsel with the pages of any medical report during the years 2020, 2021 and '22, if you can do that.

THE WITNESS: Is it all right if I write that down?

THE COURT: Sure. Your lawyer is already doing that.

THE WITNESS: Sure. I'm sure she'll tell me that. Yes, I'll do that, Your Honor.

THE COURT: Okay. My next question is fairly broad, but during this same time period of 2020 to 2022, do you recall or did you find any connection between the defendant's substance abuse and mental status with his behavior, whether it was criminal or otherwise?

THE WITNESS: I'm not aware of criminal behavior stemming from the substance use. But as I've described a little and I touched on earlier, I think that his substance use likely led to increases in terms of his lack of contact with reality, impairments in judgment, feelings of desperation at times when his medication would or the drugs would run out. That can increase anxiety and feelings of paranoia for certain individuals. So I think it was likely contributed to those problems.

THE COURT: Let me ask you this follow-up question. As an example, did his substance abuse or mental status, again, whatever it may have been during 2021 let's say, did it affect, for example, his part-time employment? Did it affect his relationship with family members and, if so, tell me what you have in your file aside from what he may have told you.

THE WITNESS: Okay.

THE COURT: To support whatever he may have told you.

THE WITNESS: Well, in terms of his employment, I believe the only information I would have had would be the pretrial record that would have documentation of his employment because I wouldn't have any documentation of his employment aside from what he told me. I had this job from this time, I lost it for this reason, and then I

went back at a certain time. So those are self-report.

The same thing, I did not do any collateral interviews with the family members in this case, so, again, any interactions that he had with the family is just based on his self-report.

THE COURT: Are you aware of what his employment was during 2020, 2021, or 2022?

THE WITNESS: Based on what he told me, he had said that during the time leading up to the first gun purchase, he had been working as a pizza delivery man, but stopped doing that at some point before that because he was too -- the anxiety was overwhelming. It wasn't working in that capacity, instead, relied upon the social security disability money for income. He said, at one point, he had been working at a plant in Michigan over the Ohio border, but that didn't last very long because of some of the similar problems where he had difficulty with rumination about the rules and he was -- felt that he was being criticized because his anxiety interfered with his performance so he lost that job. But, again, this is his self-report.

THE COURT: Are you aware of his part-time work with Chrysler, Chrysler manufacturing facility here in Toledo?

THE WITNESS: He talked about his

employment, and I don't recall. I knew that there were plants that he was working at. I recall that one of them, at least, was in Michigan. I don't remember, specifically, which plant or if there was one in Toledo.

THE COURT: When you met with him, were you aware whether he was employed or not?

THE WITNESS: He said that -- he was wearing a vest and said he had to leave and be on a shift at 5:00 that day, in fact, so he had been -- it sounded as if it were a job that he had not held terribly long, but he had a certain time that he had to leave that day.

THE COURT: Did you discuss with him how that job was going, if he was doing well, not well, et cetera?

THE WITNESS: Yes. He said that he was, at that time, he thought it's going well, but he described a pattern over time where there would be, in terms of the variation in terms of his depression and anxiety, and sometimes it wouldn't interfere with his work as much as at other times, and that when I met with him, he said it was -- it was actually tolerable and he was doing all right.

THE COURT: One second, please. How often did you meet with him?

THE WITNESS: I met with him only once for

three hours.

THE COURT: And that date was?

THE WITNESS: June 2nd of 2022 in the summertime.

THE COURT: That's all I have.

Counsel, you may follow-up as appropriate.

I'll start with Claire.

MS. CAHOON: Thank you, Your Honor. I'll just remain at counsel table for the time.

THE COURT: Not a problem.

MS. CAHOON: Just briefly.

- - -

REDIRECT EXAMINATION

BY MS. CAHOON:

Q       Dr. Wendt, you answered some questions regarding Mr. Hutchinson's substance, excuse me, opioid use disorder and you also mentioned some periods of remission in which he was not actively using?

A       Yes.

Q       Do I have that right? Okay. During those periods of remission from any kind of substance use disorder, did Mr. Hutchinson still have the other symptoms, the other mental health symptoms we discussed, the paranoia, the complicated, misaligned beliefs, the magical thinking, et cetera?

A       That's where -- okay, so between 2012 and 2017 is when I understand there was a long period of sobriety, and that's where most of the records that we have from social security in terms of the initial diagnosis of these problems occurred. So the way I read the records is that these conditions persisted during prolonged periods of sobriety; therefore, it was my conclusion that they wouldn't be, for example, a substance induced condition or entirely the product of substance abuse, that these mental health conditions stood alone.

Q       And considering that these were conditions that were the basis for a grant of social security disability, how severe would you characterize the paranoia and the other symptoms we have been discussing?

A       Well, in my opinion, this is a -- there is some disability cases that are less severe and some that are more. Based on my understanding of his -- of all the information that I have, I think this is a very, very serious case, very debilitating in terms of the symptoms interfering with his day-to-day functioning and employment where some days, weeks and months, it can be okay, then it resurfaces and when it hits, it's very debilitating.

Q       There has been some discussion about the treatments and interventions that Mr. Hutchinson has had over the years including the many visits to the ER that

you've discussed.  Would you expect someone with Mr. Hutchinson's diagnoses to get better quickly or to remain better with no ups and downs?

A        With the diagnoses that he has, these are conditions -- I think the anxiety is more consistent.  The mood disorder and psychotic disorder are conditions that wax and wane more over time.  And so depending on environmental stress, depending on treatment, participation, and depending on other -- other factors that can play into this, substance use can be one of the factors, these are all conditions that are likely lifelong and will require treatment.  The anxiety could be something that remits or becomes more able to manage with therapy and the depression as well.  The psychotic factors would really depend more on compliance with medication over time, but that's not something that's going to get better on its own. It's going to require treatment in the long-term.

                MS. CAHOON:  Thank you.  Nothing further, Your Honor.

                THE COURT:  Anything from the government?

                MR. SIMKO:  Just real quick based on his --

                             - - -

                     RECROSS EXAMINATION

BY MR. SIMKO:

Q        There was a period of sobriety between 2012 to

2017 it sounds like; is that your understanding?

A        Yes.

Q        And then in 2017, there was drug usage; is that correct?  That's where the sobriety ended?

A        Drug usage and an arrest and then I think that's when the Drug Court occurred soon after that.

Q        And so then that was another period of sobriety and then drug usage in '21; does that sound right?

A        Well --

Q        Or --

A        From what he told me, 2020.

Q        2020 up to 2021?

A        Right.  Up until his arrest for this.

Q        Okay.

         MR. SIMKO:  Nothing further.

         THE COURT:  Thank you very much.

         THE WITNESS:  Thank you, Your Honor.  I will produce that information as soon as I can.

         THE COURT:  Thank you.

         MS. CAHOON:  And, Your Honor, if I might ask a clarifying question as to about what would be most beneficial to the Court.  Would the Court like the actual medical records between 2020 and 2022 or simply a summary by Dr. Wendt about those records?

         THE COURT:  The real thing, if I can.

MS. CAHOON: Thank you. I can produce that without needing to involve Dr. Wendt.

THE COURT: Great.

THE WITNESS: These are all records that I received from defense counsel.

THE COURT: Thank you very much.

MS. CAHOON: Thank you, Your Honor.

THE WITNESS: Good afternoon.

THE COURT: Any other testimony from witnesses that the defense would like to offer?

MS. CAHOON: Not at this time, Your Honor. We certainly reserve the right to call an additional fact witness if it was necessary in further discussion of the guidelines.

THE COURT: Any witnesses from the government?

MR. SIMKO: No, Your Honor.

THE COURT: Pursuant to our conversations then, I'm going to continue your sentencing, Mr. Hutchinson, and we locked in on the date of Friday, February 3rd, 10:30 a.m. And, as I indicated to counsel, I will likely issue yet this week an Order with some questions that I'd like you to give some thought to that would likely encourage you to file a very brief brief. I know that you have already touched on the topic of my

concern, which is whether an enhancement applies, and that enhancement would be the prior robbery conviction as a crime of violence under the guidelines 4B1.2(a)(2) and there has been some briefing on it, but I think defendant properly noted that the government did not respond directly to the defendant's arguments regarding whether that prior robbery conviction qualifies for the enhancement. And, again, I'll have some specific questions on that point, and until I get a resolution of whether that applies or not, I can't confirm a guideline range.

And so that's the first thing I will do when we reconvene. I will take what I have, what you may give me, and we'll start the hearing with a perhaps very brief discussion. It's my hope to have something written out for you ahead of time and then we'll go from there.

Any questions, counsel?

MS. CAHOON: Your Honor, the only -- I'm sorry. The only additional thing I would ask is a sealing order so that the medical records could be provided on the ECF.

THE COURT: Of course. Counsel, when you submit the medical records, if you will, when filing, I'm told, refer it to the Order or your sentencing memo that was filed under seal. It will capture that, and you won't have to file another motion to file under seal.

MS. CAHOON:  Thank you, Your Honor.

THE COURT:  It will be included as part of my Order earlier since it was part of your sentencing memo of sorts by request.

MS. CAHOON:  Thank you, Your Honor.

THE DEFENDANT:  Thank you, Your Honor.

THE COURT:  Thank you.  Any other questions?

MR. SIMKO:  No, Your Honor.

THE COURT:  I'm going to apologize.  I see a number of folks that came today expecting a conclusion.  I apologize for that, but there's a decision that needs to be made and I want to make sure I get it right.

We are adjourned.  Thank you.

THE DEFENDANT:  Thank you, Your Honor.

(Proceedings adjourned at 3:11 p.m.)

- - -

**C E R T I F I C A T E**

I, the undersigned, hereby certify that the above and foregoing is a true and accurate record of the proceedings held in the above-entitled matter prepared from my stenotype notes.

*/s/ Diana M. Ziegelhofer*_____**1/20/2023**__
Diana M. Ziegelhofer, RPR, RCR
Official Court Reporter
United States District Court
1716 Spielbusch Avenue, Suite 118
Toledo, Ohio 43604
419-213-5538